AO 91 (Rev. 08/09) Criminal Complaint

**FILED**

JUN 2 2 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. |
| ROBERT G. TUNNELL, JR. | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

**3  11  70690**

*EDL*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____October 5, 2007,_____ in the county of ____San Francisco____ in the ____Northern____ District of ____California____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1343 | Wire Fraud |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

✓ Continued on the attached sheet.

_____
*Complainant's signature*

Jeremy Desor / Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 22, 2011

_____
*Judge's signature*

City and state: San Francisco, California

United States Magistrate Judge Elizabeth D. Laporte
*Printed name and title*



## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT,
## SEARCH WARRANT, AND SEIZURE WARRANTS

I, Jeremy Desor, being first duly sworn, hereby depose and state as follows:

A.    Introduction and Agent Background

1.    I make this affidavit in support of the following: (a) a criminal complaint against ROBERT GORDON TUNNELL, JR., who resides at 550 Battery Street, Suite 2001, San Francisco, California (the "Residence"); (b) an application for a warrant to search the Residence; and (c) applications for seizure warrants for Bank of America accounts controlled by TUNNELL (the "Subject Bank Accounts") and an Interactive Brokers, LLC investment account controlled by TUNNELL (the "Subject Investment Account"). As set forth below, there is probable cause to believe TUNNELL has committed mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, respectively.

2.    I am a Special Agent of the Federal Bureau of Investigation (FBI), and I have been so employed for approximately six years. I am currently assigned to the San Francisco Division of the FBI. As part of my assigned duties, I investigate possible violations of federal criminal law. I have worked in the Chicago Division of the FBI and the San Francisco Division of the FBI. In each of those offices, I have been assigned to squads that focus on the investigation of white collar crimes. During my career as an FBI agent, I have participated in more than 25 such white collar investigations, and I have been the lead or co-lead agent in more than 15 of those investigations.

3.    This affidavit is based on my personal knowledge and information obtained from documents, witnesses, and other law enforcement officials. The information contained in this affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint against TUNNELL and in support of the applications for a search warrant and seizure warrants. As such, this affidavit does not include all of the information that I acquired while participating in this investigation.

B.    Probable Cause to Believe Crimes Have Been Committed

4.    In summary, and among other information, Victim 1 provided me with the following information:

a.    Victim 1 met TUNNELL in approximately 2005. Sometime thereafter, Victim 1 began dating TUNNELL and continued to date TUNNELL for approximately five to six years. During this time, TUNNELL told Victim 1 that he was a partially-retired or semi-retired international attorney. TUNNELL also told Victim 1 he was a very successful investor. TUNNELL told Victim 1 he had made a lot of money investing his own money in commodities such as copper and coffee. TUNNELL told Victim 1 he also invested money on behalf of friends as a favor and did not receive any compensation for his investment services.

b.      Victim 1 began providing money to TUNNELL for investment beginning in 2006 and continuing through 2007. Victim 1 provided a total of approximately $850,000 to TUNNELL during this time period. Victim 1 provided this money to TUNNELL mostly by liquidating assets in a Charles Schwab account. Victim 1 typically wired the funds to bank accounts in the name of TUNNELL and/or TUNNELL's company "TCO INTERNATIONAL". TUNNELL told Victim 1 that he could guarantee significant returns on her money, as high as 20% per year. TUNNELL told Victim 1 that her money would be invested in short-term investments that could be liquidated easily in the event she wanted to withdraw any funds. TUNNELL told Victim 1 that her money was invested in commodities. TUNNELL told Victim 1 that he had worked hard to develop his very successful trading strategy, but that he could not provide her with much detail because his strategy needed to remain confidential.

c.      Victim 1 was able to withdraw funds from her account with TUNNELL over time. Victim 1 also added $350,000 into her account in 2010. Victim 1 estimated her outstanding principal balance (excluding capital gains reported to her by TUNNELL) to be about $575,000 as of April 11, 2011.

d.      TUNNELL did not provide Victim 1 with a written investment agreement or formal account statements. TUNNELL did provide Victim 1 with certain letters and e-mail communication detailing certain terms of Victim 1's investments in TUNNELL's "Karmah Fund" and "TCO Investment Fund". TUNNELL also provided e-mails to Victim 1 in which he summarized the gains to Victim 1's investments on a monthly, quarterly, and/or annual basis. With the exception of one month, TUNNELL reported gains in Victim 1's investments.

e.      Victim 1's sons thought she had too much money invested with TUNNELL and were concerned by the lack of information Victim 1 had about the investments. These concerns led Victim 1 to suggest to TUNNELL in approximately December 2010 that he begin paying her $30,000 per month until her entire account was liquidated. TUNNELL initially agreed to this arrangement but then stopped communication with Victim 1 for several weeks. Up until that point, TUNNELL had called Victim 1 almost every morning and the two saw each other almost every weekend.

f.      In approximately mid-January 2011, Victim 1 sent a series of e-mails to TUNNELL regarding her money. Included in the e-mails was a request to have all of her money returned to her before the end of March 2011. TUNNELL responded to Victim 1 by telling her she was being irrational. TUNNELL assured Victim 1 her money was safe. TUNNELL warned Victim 1 she would be exposed to significant capital gains taxes if she withdrew her money.

g.      In approximately March 2011, TUNNELL met with Victim 1 and one of her sons at Victim 1's home. During this meeting, TUNNELL laid out two options for Victim 1. The first option was that she receive back only her $565,000 principal paid out to her over a one-year period. This option did not provide for Victim 1 to receive any of the gains TUNNELL had reported to her over time. In a balance update Victim 1 received from TUNNELL in an e-mail

2

dated February 16, 2011, he reported Victim 1's balance as $1,413,603. This balance purported to take into account all withdrawals and gains over the life of Victim 1's investment. The second option TUNNELL gave to Victim 1 was that she receive a total of $905,000 paid out on the following schedule: $30,000 per month for a two-year period, plus a lump-sum payment of $85,000 on January 1, 2013, plus another lump-sum payment of $100,000 on April 1, 2013. At this meeting, TUNNELL provided Victim 1 with a handwritten note detailing these options. At the meeting, Victim 1 and her son questioned TUNNELL about why Victim 1 would not receive all the gains TUNNELL had reported to her. TUNNELL responded by threatening to leave the meeting. TUNNELL told Victim 1 she had to choose one of his two options if she wanted to get any of her money back. TUNNELL said he was offering Victim 1 a very fair deal. TUNNELL told Victim 1 that she would have lost a significant amount of her money had she invested it in the stock market or in real estate rather than with TUNNELL. At the meeting, TUNNELL told Victim 1 that her money was tied up in long-term investments. TUNNELL said there were penalties associated with taking the money out of the long-term investments. Prior to this meeting, TUNNELL had told Victim 1 that her money was in short-term, liquid investments.

      h.     During this meeting, TUNNELL provided a handwritten note titled "TCO-RGT Summary Statement of Assets and Investments" (the "Net Worth Statement"). Victim 1 provided me with a copy of the note, which was dated January 27, 2011. The note reflected a total of $24,097,000 in assets. The note included a line reflecting $6,800,000 as "Owed to All Investors - No other Debts or Liabilities". The calculations on the note claimed a "Net Equity - Net Worth" of $17,297,000.

      i.     TUNNELL subsequently provided Victim 1 with a typed "Agreement" outlining the second option. Victim 1 provided me with a copy of the agreement. TUNNELL wanted Victim 1 and her son to sign the agreement, which included a clause stating in part: "[Victim 1] hereby agrees, acknowledges, and accepts ... to release, acquit, settle and forever discharge TCO and Bob ... from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, attorneys' fees, expenses and compensation whatsoever ... in any way growing out of or resulting from their past relationship, dealings, investments or agreements."

    5.     Victim 1 provided me with two letters TUNNELL provided outlining certain terms relating to TUNNELL's investments. I have reviewed these documents, which include the following:

      a.     A letter dated August 3, 2005, titled "Key Points of Bob Tunnell Short Term Guaranteed 12% Investment Program", stated in part as follows:

> "Over the last few years I have developed a short term investment vehicle for a few friends and family members who have asked for my assistance ... In most cases, I do this as a favor to people who are close to me and want and need the help ... The funds ... are for the most part in liquid form

3

or readily convertible to cash ... Over the years I have gotten to be good at being a conservative trader and investor ... I have been fortunate to achieve a good record of returns that makes it comfortable for me to pay out a fixed, guaranteed 12% on any money I take in ... Funds can be withdrawn on demand and for any reason simply by request to me with some reasonable notice (25 to 30 days) ... Within my sole discretion, I have and will continue to pay a bonus increase in the annual interest rate of 3% as applied to principal after year end if and when my annual return is substantial enough for me to justify such largesse ..."

b.  A letter dated February 11, 2006, stated in part as follows:

"I have labeled a new investment account KARMAH, which should bring us all good fortune. It started up in February 2005, and yielded over 20% to its initial investors at year end January 31, 2006 ... I will use my usual strategy and tactics to generate as substantial a return as possible, but always with a guarded approach ... I do not plan to do anything more or extra aggressive ..."

6.  Victim 1 also provided me with certain e-mail communication she had with TUNNELL. The e-mails included e-mails from TUNNELL to Victim 1 acknowledging the receipt of funds from Victim 1. TUNNELL confirmed receipt of a total of $850,000 from Victim 1 in five separate installments between March 2006 and October 2007. TUNNELL also confirmed he received an additional $350,000 from Victim 1 on or around October 18, 2010.

7.  The e-mails also included confirmation of funds returned to Victim 1. In all, the e-mails detailed the return of a total of $695,000 to Victim 1 from January 2009 through June 1, 2011. Based on this information, Victim 1's net principal balance as of April 4, 2011, was approximately $505,000 ($1.2 million minus $695,000).

8.  TUNNELL provided Victim 1 with account updates by e-mail on an almost monthly basis. The e-mails typically summarized the capital gains for Victim 1's account for the month, quarter, and/or year. The e-mails typically provided an updated account balance for Victim 1's account. The e-mails did not include detail as to what assets made up Victim 1's investment portfolio. I have reviewed approximately 47 account-update e-mails sent from TUNNELL to Victim 1 prior to the meeting in which Victim 1 and her son talked to TUNNELL about their concerns and their desire to have Victim 1's money returned in full. These e-mails provided account balances to Victim 1 for a time period covering April 30, 2006, through January 31, 2011. In these e-mails, TUNNELL reported gains in every time period with the exception of one. In that one exception, TUNNELL reported a loss of approximately $10,654 over approximately a two-month period. In all, the e-mails reported total gains to Victim 1 of approximately $737,000 from April 2006 through January 2011. The final report showed Victim 1's total net balance to be $1,413,603 as of January 31, 2011. This balance took into account all

4

withdrawals, new investments, gains, and other accounting adjustments over the life of Victim 1's investments with TUNNELL.

9. The account-update e-mails detailed total capital gains to Victim 1 of $257,034 from September 30, 2007, through February 29, 2009. Based on Victim 1's September 30, 2007, balance as reported by TUNNELL of $1,041,481, this represented a total gain of approximately 25% during this time period. During the same time period, the Dow Jones Industrial Average (DJIA) dropped from 13,896 as of September 30, 2007, to 7,063 as of February 28, 2009. This marked a drop of approximately 49% in the value of the DJIA during the period in which TUNNELL reported 25% gains to Victim 1.

10. Certain account-update emails Victim 1 received from TUNNELL are summarized as follows:

        a.     On January 10, 2007, TUNNELL wrote in part:

"...I couldn't wait to report to you that the fund has grown by 3.75% net to you over the last two months of November and December (even while as you know the Grand Master Shuffler was actually away for two weeks of that time), resulting in a gain to you of $21,059, bring [sic] your grand total as of Dec. 31, 2006 to $582,634."

        b.     On April 11, 2007, TUNNELL wrote in part:

"This confirms receipt today in the TCO bank account of your $150,000 to be invested in the new and dynamic TCO Growth Investment Fund, which will launch active business this coming Monday..."

Beginning with the account-update e-mail report for April 30, 2007, and continuing through the report for January 31, 2008, TUNNELL provided Victim 1 with updates for her investment in the Karmah Fund as well as the TCO Investment Fund.

        c.     On May 9, 2007, TUNNELL wrote in part:

"For the quarter Feb. 1 to April 30, KARMAH made a net gain for you of 5.07%, including a gain of 1.69% in April ... you gained $30,008 in the quarter, bringing your total net balance as of April 30, 2007, to $621,880 ...On April 12, 2007, TCO received your wire transfer of $150,000 into the new TCO INVESTMENT FUND, which seeks a more aggressive, yet still safe, higher investment return. After initial organizing of accounts and set-up, which meant the Fund was active for one-half of the month, we gained a net total to you of 1.04%, which equals $1,560. This makes your total as of April 30, 2007 -- $151,560..."

5

d.      On September 4, 2007, TUNNELL wrote in part:

"I thought I would make a few comments on the financial picture. As I have been reporting to you last month, the markets have been highly volatile and turbulent. There is much irrationality and fear. As you know my strategy, I have been picking my way through and around the mine field, always searching for modest gains that will add up to a good total. And staying away from trouble ... These circumstances are a good test of my investment/trading philosophy and strategy to aggressively manage risk to avoid loss and sustain and maintain a steady return in excess of 20% annually, which I am happy to say we have done. For August, in the KARMAH FUND we gained 1.894% ... which brings your KARMAH total to $663,021 as of August 31, 2007. TCO INVESTMENT FUND gained a solid 2.085% (or over 25% p.a.) in August, in spite of all the turbulence or maybe because ... bringing this total to $163,564. (It is obvious we need more money in this account to produce an even greater return!)"

In apparent contrast to these reported gains, an analysis of TUNNELL's identified trading accounts reflected that for the two months ending August 31, 2007, TUNNELL lost approximately $880,000 trading, leaving the total balance in his identified trading accounts at approximately $15,600.

e.      On February 12, 2008, TUNNELL wrote in part:

"I am pleased to give you a continuing good report for this fiscal year end. Our steady growth and solid capital gains proceed on, even in spite of and perhaps because of the very turbulent market conditions that have prevailed over the last year. As you know and I like to repeat, we are pursuing a strategy of careful, cautious yet aggressive investing that takes advantage of market moves up or down and in many different financial instruments and products as the opportunities arise. Getting right to the point, the TCO KARMAH FUND gained 22.65% net to the investors over the entire fiscal year 2007, ending on January 31, 2008 – which is our best gain yet ... bringing your total to $721,398. TCO INVESTMENT FUND did not do as well in January or in the fourth quarter, gaining .71% for the month of January. This pulled down the return rate for the full fiscal year to 19.2%, which is still actually quite good ... to bring your total now as of January 31, 2008 to $390,207 ... I have come to the conclusion that I and the 4 other investors in this Fund would be better off by merging it back into the KARMAH FUND, where I am confident we will continue to have good success ... Your total balance with TCO is now $1,111,605. I remain cautious and conservative just to grind out a steady, good return in the face of high volatility. The stock market has fallen sharply, and the US dollar is still way down ..."

6

     f.     In an update on Victim 1's September 2008 account performance, TUNNELL wrote in part:

> "In spite of wild market conditions, TCO gained 1.71% percent [sic] for your account in the crazy month of September ... bringing your grand total with TCO up to $1,254,430 as of Sept. 30, 2008. As you know I have been predicting for several years, the US economy has really hit the skids. There is big trouble now and there is more to come. And as I trust you would have expected, I have been prepared and planning for this for some time. So we were and still are ready to take advantage of whatever happens to continue our steady, aggressive yet careful strategy to generate solid capital gains ... I am further happy to report that we very well survived the incredible market gyrations of today, with the Dow at one point dropping over 800 points ... I am sticking to my now tried and true method to seek out steady gains where there are opportunities and to avoid risk and losses where there are not ..."

     g.     On December 8, 2008, TUNNELL wrote in part:

> "... a rough month in the financial markets. As I advised before, I have been more cautious given the treacherous market conditions that now prevail. Nonetheless, we made a decent return of 1.51% for November, keeping us on track to exceed 20% for the year. Therefore, you gained $19,245 for November, bringing your total balance as of Nov. 30 to $1,290,746 ... To keep you informed of what I am up to these days, below is a recent report I have prepared for some of my investors who have asked me to provide them a fixed return for short term cash over 16 months in the form of a TCO Certificate of Investment Deposit."

TUNNELL then detailed the "New TCO 12% Certificate of Investment Deposit" in his e-mail, including the following information:

> "the yield on the long T Bond is now approaching 3.0%, an unheard of low ... short term yields for money market, savings, T Bills and other cash type accounts will be under 1.0%. Today, there is virtually no where to go to gain any kind of safe return on cash, which is where everyone needs to be. The huge increase in T bond values is a strong indicator that the current economic situation will lead to a sustained and deep recession/depression. The stock markets are not likely to begin recovery until 2010. At the request of some of our investors, TCO has initiated a new short-term investment vehicle to answer the crying need for a better yield. We have issued a Certificate of Investment Deposit ... paying 12% per annum ... guaranteed and payable in 16 months ... I stand behind and guarantee repayment 100%. Early withdrawal may be made at any time without penalty. I believe this is a sound way to generate an excellent return safely...It will enable investors to ride out the coming dismal year with good results and then

be prepared for other investments starting in 2010. It is also an easier way for me to manage a safe, sound and high yield for TCO investors. I would prefer that investments be made in increments of $100,000 for accounting and reporting purposes..."

h.  On February 5, 2010, TUNNELL wrote in part:

"In spite of extremely difficult trading conditions and very low interest rates and yields, TCO generated a return for the fiscal year ending January 31, 2010, of 16.1% ... I am taking a more cautious approach to reduce and avoid risk of loss but still generate a high return. I learned yesterday that the Bank of America is only paying .50% p.a. on a one million dollar deposit ... TCO at 16% is paying 32 times that rate of return. I also note the stock market is heading back into the tank ... You gained over the fiscal year a net of $177,065...I will continue using the same trading and investing strategy that I have been doing over this past year... I am confident we can maintain are [sic] projected rate of return for fiscal year 2010 in the range of 14.5% to 17.5%."

i.  On May 6, 2010, TUNNELL wrote in part:

"Just as I have been predicting for several months, the stock markets took a major dive today and this week ... we have been completely prepared for this and the capital gains we achieved this week will show up in the end of May report. Meanwhile, our slow, steady and sure as well as cautious approach, which paid off in today's crazy market actions, continued to generate a favorable return in the first quarter, particularly compared to the stock market ... you gained $40,906 for the quarter, bringing your balance up to $1,198,062 as of April 30, 2010..."

11.  Following the meeting with Victim 1 and her son, TUNNELL provided Victim 1 with an updated "pro forma" report for Victim 1's account. The report was provided by e-mail on April 26, 2011. In this report, TUNNELL made various downward adjustments to lower the value of Victim 1's account. TUNNELL reduced the account by $39,600 for "Cost for premature large payout of $195,000 in one quarter." TUNNELL made further reductions of $99,700 for "Accounting adj. of valuation of CHIC stock ... ". TUNNELL reduced the account balance by another $43,900 for "Estimated accounting adjustment for fiscal year 2011 (same as last yr)". TUNNELL also deducted distributions made to Victim 1 totaling $195,000 from the time of the last report showing a balance of $1,413,613 as of January 31, 2011. All of these reductions resulted in a new balance of $1,052,713 for Victim 1.

## OTHER INVESTORS / TRADING RECORDS

12.  Victim 1 informed me that TUNNELL invested money on behalf of several other

individuals. This information has been corroborated. For example, from January 2006 through April 2011, TUNNELL's bank records reflected approximately $10 million in deposits that appeared to be intended as investments with TUNNELL. I also have reviewed e-mails reflecting that at least some of the individuals who provided these funds also received regular account-update e-mails in the same format as Victim 1.

13.     An analysis of the bank records reveal that TUNNELL used almost all of the $10 million to invest in commodities or to repay other investors. TUNNELL typically transferred investor funds into commodities accounts he controlled. TUNNELL then withdrew funds from the commodities accounts as needed to make distributions to investors. In the meantime, TUNNELL was suffering significant losses in his trading activities. The bank records reflect approximately $3.2 million being paid to apparent investors from January 2006 through April 2011. Many of these payments had "Return of Capital" written on the check memo line.

14.     The investments made by TUNNELL with the funds he received consisted almost entirely of investments in his commodities trading accounts. In all, TUNNELL transferred about $9.4 million from his bank accounts to his trading accounts from January 2006 through April 2011. No other investments of significance were identified from reviewing the bank records. During this time period, TUNNELL had bank accounts in the names of Robert Tunnell, TCO International, and TCO International China Fund, LP, and investor funds were transferred or deposited into all of these accounts.

15.     TUNNELL withdrew funds from his commodities accounts to be deposited back into his bank accounts to make distributions to his investors. TUNNELL transferred approximately $2.8 million from his commodities accounts back to his bank accounts between January 2006 and April 2011. The remainder of the approximate $9.4 million TUNNELL deposited into the accounts was lost as a result of TUNNELL's trading activity (with the exception of approximately $88,000 that remained in the commodities accounts as of April 30, 2011).

16.     I have reviewed many emails sent from TUNNELL to his investors. The e-mails included regular account updates sent to four investors, in addition to Victim 1, going back to reports for August 31, 2008, and continuing through reports for April 30, 2011. Other investors received less regular updates.

17.     The content in the account-update e-mails sent to other investors was similar to those sent to Victim 1 as described above. In many cases, TUNNELL's commentary was the same to all investors for any given month, with TUNNELL changing the capital gain amounts and account balances to individualize the reports. Just as with Victim 1, TUNNELL reported consistent and significant gains to these investors over time. TUNNELL repeatedly referenced his "cautious" and "steady" investment strategy. My analysis showed, however, that TUNNELL was investing almost all funds in the volatile commodities market and often experienced significant gains and losses on single trades.

18.     Certain account-update e-mails TUNNELL sent to investors are summarized as follows:

        a.     Reporting on investor MH's account balance as of November 30, 2008 (which was the end of a month in which TUNNELL's trading resulted in losses of approximately $1.4 million and the end of a two-month period in which TUNNELL's trading resulted in a total loss of approximately $3 million):

                "...As I advised before, I have been more cautious given the very treacherous market conditions.  Nonetheless, we have made a decent return of 1.51% for November, keeping us on track to exceed 20 % [sic] for the fiscal year.  Therefore, you gained $42,547...for November, bringing your total balance...to $2,860,225...I intend to continue grinding out the good gains we have been achieving even in these difficult times..."

        b.     Reporting to investor KA for the six-month period ending July 31, 2010 (a period in which TUNNELL's trading resulted in losses of approximately $714,000, leaving him with approximately $93,000 liquidity in the accounts):

                "...Our investment program continues to progress in a solid, conservative, steady way, producing a 7.02% return on the half year so far.  This is far better than the stock market...I continue my prudent and careful approach to earn a reasonable and in fact very good return, combining excellent growth while protecting your assets from losses.." TUNNELL then reported a six-month gain for investor KA of "$119,554" for a total balance of "$1,812,624".

19.     I have reviewed account statements for all known trading accounts associated with TUNNELL.  Although TUNNELL was reporting consistent gains to his investors over time, he was often suffering large losses from his commodities trading activity.  From January 2006 through April 2011, TUNNELL's commodities trading resulted in total losses of about $6.7 million.  According to the account updates TUNNELL sent to Victim 1 and four other investors, the total account balances for these five investors as of April 30, 2011, was $10.7 million, far exceeding the balance of approximately $88,000 in TUNNELL's trading accounts at that time.  Because it appears that TUNNELL sent the account updates to only some of his apparent investors, the $10.7 million figure likely represented only a portion of the funds TUNNELL's investor group expected to have in their accounts at the time.

20.     In all months for which account-update e-mails were found, TUNNELL reported account balances to his investors that greatly exceeded the value of all his identifiable assets.  For example, TUNNELL reported that eight investors had a total of $10.4 million in their accounts with him as of June 30, 2010.  At that time, TUNNELL had about $290,000 in identifiable liquid assets.

21.     My analysis revealed that investors EG, KA, and MH received regular account updates by e-mail and had the highest account balances with TUNNELL. In all available months, the account balance TUNNELL reported to investor MH alone exceeded his identifiable assets. In almost every available month, each of the balance amounts reported by TUNNELL to investors EG, KA, and Victim 1 exceeded TUNNELL's total identifiable assets.

### APPARENT ONGOING FRAUD

22.     I have reviewed e-mails reflecting that TUNNELL was soliciting $375,000-$750,000 in funds from investors KC and DC as recently as May 29, 2011. In response to TUNNELL's solicitation, investor KC wrote on May 29, 2011:

> "...we are checking ... to see if we can come up with $375k now...regardless, we will send a significant chunk if not all of it this week."

In an email on May 31, 2011, TUNNELL solicited a $375,000 investment from investors GW and KW. Bank records also reflected two deposits from apparent investors totaling $115,000 in April 2011.

### EVIDENCE OF WIRE TRANSACTIONS AND MAILINGS

23.     TUNNELL's bank records showed a significant number of wire transactions to and from investors and to and from TUNNELL's commodities accounts. In all, the records showed approximately 120 such wire transfers. In several e-mails, TUNNELL referred to mailing certain investment notes or related documents to investors. TUNNELL also made and received certain payments by check. Some of TUNNELL's investors live outside California, making it likely the mails were used in furtherance of TUNNELL's scheme.

24.     As one example of an interstate wire in furtherance of the scheme, on or about October 5, 2007, TUNNELL caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds, namely, a wire transfer of $200,000 from Victim 1's bank account via the Fedwire system routed through New Jersey and deposited into TUNNELL's account at Bank of America in San Francisco.

C.     Probable Cause to Believe Evidence Will be Found in the Residence

25.     The Residence has been linked to TUNNELL in many ways. Public database searches reflected the Residence as TUNNELL's most recent address. Victim 1, who dated TUNNELL for five to six years, informed me that the Residence was where TUNNELL lived. The Residence was the listed address on investment account statements for all TUNNELL-controlled accounts from April 2006 through April 2011 (the most recent month for which I have statements). TUNNELL listed the Residence as his address on account-opening related documents with trading firms "Refco" (December 2003), "FC Stone" (March 2006), and

11

"Interactive Brokers" (August 2010). All of TUNNELL's personal and business bank statements that I have reviewed from Bank of America were addressed to the Residence (from January 2006 through April 2011).

26.     Victim 1 informed me that TUNNELL conducted his business operations out of the Residence. Victim 1 advised TUNNELL used the dining room area as his office. Victim 1 advised TUNNELL had a computer set up as part of his office. Victim 1 described TUNNELL as a "bit of a hoarder" and said he maintained boxes of records throughout his apartment. Although Victim 1 has not been to the Residence in about two or three years, Victim 1 has continued to see and communicate with TUNNELL since last visiting the Residence. Victim 1 advised that TUNNELL was frequently at home and claimed to be working in his home office during their telephone conversations. TUNNELL has told Victim 1 that he does not have a storage space or any other place to store records other than in the Residence.

27.     I have reviewed records that show that TUNNELL conducts business from the Residence. The Residence is the registered address on the Secretary of State "Articles of Organization" for TCO INTERNATIONAL, LLC (TCO) (May 2001). TUNNELL listed the Residence as the address for TCO on account-opening related documents with commodities trading firms Refco (December 2003) and FC Stone (March 2006). All TCO account statements from commodities trading firm Rosenthal Collins Group were addressed to TUNNELL's attention at the Residence, including the April 2011 statement (the most recent statement I have). All TCO Bank of America account statements were sent to TUNNELL's attention at the Residence, including the April 2011 statement.

28.     In approximately March 2011, Victim 1 obtained a handwritten Net Worth Statement from TUNNELL dated January 27, 2011. The document listed the assets of TUNNELL and TCO. The document was on TCO letterhead showing the Residence as the address. The document included the following statement:

> "Duplicate copies of all financial records are maintained in [TUNNEL's] home office..."

29.     On February 7, 2011, TUNNELL sent an e-mail to investor MH. In the email, TUNNELL wrote the following:

> "...As you requested, here is some information on contact points for me...
>
> Robert G. Tunnell
> Manager, TCO International
> 550 Battery St. Suite 2001
> San Francisco, CA 94111....
>
> ....My Executor/Trustee is instructed and authorized to collect in all of my assets and then

pay out all funds still owed to any investors in accordance with my records, which I keep current on a monthly basis. The records provide all details of the addresses, phone numbers, current account status, etc..."

30.    On April 5, 2011, TUNNELL sent an email to Victim 1 with an attached "Agreement". In the Agreement, TUNNELL wrote:

"...Robert G. Tunnell ('Bob') of 550 Battery St. Apt. 2001, San Francisco, CA 94111; TCO International LLC ('TCO'), a California limited liability company, located at 550 Battery St. Suite 2001, San Francisco, CA 94111..."

31.    TUNNELL's bank account records showed monthly checks payable to "Golden Gateway Center" (GGC) from June 2006 through April 2011. The address printed on all the checks was the Residence. Several of the checks referenced "Rent" on the "For" line. A check dated January 7, 2010, referenced "Parking" and "#2001". On June 15, 2011, I contacted GGC by telephone and spoke with an office employee, who confirmed GGC was the property manager for the building located at 550 Battery Street in San Francisco.

D.    The Seizure Warrants

APPLICABLE STATUTES

32.    Title 18, United States Code, Section 981(a)(1)(A) provides for the civil forfeiture of "any property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957, or 1960" of Title 18, or any property traceable to such property. Title 18, United States Code, Section 982(a)(1) provides for criminal forfeiture of any such property.

33.    Title 18, United States Code, Section 981(a)(1)(C) provides for the civil forfeiture of "any property, real or personal, which constitutes or is derived from proceeds" traceable to any offense constituting "specified unlawful activity" ("SUA"). Title 18, United States Code, Section 1956(c)(7) defines SUAs to include mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343. Title 18, United States Code, Section 982(a)(2)(A), along with Title 28, United States Code, Section 2461(c) provides for the criminal forfeiture of all proceeds traceable to violations of Title 18, United States Code, Sections 1341 and 1343.

34.    Title 18, United States Code, Section 984 provides:

(A)(1) In any forfeiture action in rem in which the subject property is cash, [or] funds deposited in an account in a financial institution...(A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property. (2) Except as provided in

subsection (b), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section. (B) No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis of the forfeiture may be commenced for more than 1 year from the date of the offense.

35.     Here, as set forth above, the investigation indicates that the offense is ongoing. There is probable cause to believe that payments from victims of TUNNELL's scheme were deposited, directly or indirectly, into these accounts, and that these are proceeds of SUA's.

## THE SUBJECT INVESTMENT ACCOUNT

36.     I discovered only one commodities account in which TUNNELL was actively trading as of April 30, 2011. The account is held at Interactive Brokers, LLC (Account U923461 in the name of Robert G. Tunnell). This account was opened in August 2010 and received $892,500 in deposits from August 2010 through April 2011. These deposits were received from transfers from TUNNELL's accounts at Bank of America. The funds deposited into the Bank of America accounts prior to the transfers came directly from investors in TUNNELL's purported investment programs. Over time, TUNNELL lost approximately $622,000 of the funds as a result of his trading activities. TUNNELL withdrew another $182,000 from the account. As of April 30, 2011, the account balance was $88,202. Although I believe the account will contain substantially less funds, I seek authority to seize up to $892,500 from the Subject Investment Account.

37.     The funds remaining in the Subject Investment Account belong to the victims of TUNNELL's scheme. If TUNNELL had been successful in obtaining additional investment funds since April 30, 2011, his pattern of behavior shows he likely would have transferred the funds into the Subject Investment Account from the Subject Bank Accounts, or that they would be in the Subject Bank Accounts pending transfer to the Subject Investment Account.

## THE SUBJECT BANK ACCOUNTS

38.     I learned that TUNNELL had two open Bank of America accounts as of April 30, 2011: account number 07699-40852 in the name of Robert Tunnell and TCO International; and account number 02896-02681 held jointly by Robert Tunnell and Gale Tunnell. It appears from the account activity that ROBERT TUNNELL controls the account that is still held jointly.

39.     As of January 12, 2011, account 07699-40852 had a balance of approximately $179. Between January 12, 2011, and April 18, 2011, $520,745 was deposited into this account directly from investors or from the Subject Investment Account. I believe that all remaining funds in this account belong to the victims of TUNNELL's scheme. Over the approximate two-year period this account has been opened, it has been funded almost exclusively with investor funds. I seek authority to seize up to $520,745 from account 07699-40852.

14

40.   Account 02896-02681 had a balance of approximately $1,321 as of April 21, 2011. Since the account balance reached about $446 on April 1, 2011, the deposits to the account were funded by approximately $5,983 in transfers of investor funds from TUNNELL's Bank of America account 07699-40852 and by a $2,500 wire (that does not appear to have been from an investor). I seek authority to seize up to $5,983 from account 02896-02681.

E.   Conclusion

41.   Based upon the foregoing, I believe there is probable cause to believe that TUNNELL has conducted and continues to conduct a scheme to defraud, in violation of Title 18, United States Code, Sections 1341 and 1343. I have probable cause to believe the Residence contains evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1341 and 1343. Further, I have probable cause to believe the Subject Investment Account and Subject Bank Accounts contain funds obtained by TUNNELL as a result of his fraudulent scheme. Accordingly, I respectfully request a search warrant authorizing the search of the Residence, as more fully described in Attachment A, for the items described in Attachment B, including any computers, which will be searched in accordance with the protocol set forth in Attachment C. I also request that seizure warrants be issued for the funds in the Subject Investment Account and the Subject Bank Accounts, as further described in Attachment D.

F.   Request for Sealing

42.   Because this investigation is continuing, and because the arrest, search, and seizures will take place some time after this Affidavit is executed, I believe that disclosure of this Application, Affidavit, Search Warrant, or Seizure Warrants likely would jeopardize the progress of the investigation. Accordingly, I request that the Court issue an order that the entire file in this matter be sealed until further order of the Court.

JEREMY DESOR
Special Agent, Federal Bureau of Investigation

Sworn to and subscribed before me
this **22nd** day of June, 2011

ELIZABETH D. LAPORTE
United States Magistrate Judge

15

## ATTACHMENT A

## DESCRIPTION OF PREMISES TO BE SEARCHED

The Residence is located at 550 Battery Street, Apartment 2001, San Francisco, California, 94111, and is further described as follows:

The Residence is located inside a large light-colored building on the east side of Battery Street spanning the block between Washington Street to the south and Jackson Street to the north. There are two fountains in the courtyard in front of the building. The building number, "550", is written in white above a glass door entrance. The words "The Gateway" are on the building above an arch above the entrance and on the glass windows next to the entrance. There is a Bank of America on the ground level in the same structure just south of the residential entrance. There is an office for "Advanced Dentistry" located on the ground level just north of the residential entrance with the address "556" displayed.

The lobby inside the residential entrance has three elevators. The Residence is located on the 20th floor of the building. The Residence is located in the northeast corner of the hall and is accessed by turning right off the elevator and walking to the end of the hall. The door to the Residence is the last door on the right of the hallway next to a stairwell. The door to the Residence has the number "2001" written in black above a silver peephole. The door to the Residence has a silver door handle and lock.

## ATTACHMENT B

### ITEMS TO BE SEIZED

The items set forth in this Attachment are evidence, fruits, and instrumentalities of mail and wire

fraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

For the time period of 2005 to present:

      1.      Bank and financial institution (including trade or brokerage account) records,

documents, and materials, including, but not limited to, loan agreements, mortgage records, line

of credit agreements, periodic statements, deposit receipts, records of wire transfers, checks,

cashier's checks, drafts, notes, acceptances, traveler's checks, letters of credit, safety deposit box

records, money orders, check ledgers, certificates of deposit, checkbooks, cash, credit cards, debit

cards, negotiable instruments, and/or any documents reflecting receipt or disbursement of funds.

      2.      Diaries, calendars and appointment books.

      3.      Address books, telephone directories, and contact databases.

      4.      Articles of Incorporation, bylaws, lists of Officers and Directors, ownership

records, state business licenses, tax returns filed, corporate minutes, notes, and documents related

to TCO International, LLC; TCO International China Fund LP; Karmah Fund; and/or TCO

Investment Fund.

      5.      Records relating to any investments with, or ownership in, any private companies,

private-equity funds, and/or hedge funds.

      6.      Records relating to any business Robert Tunnell has conducted or is conducting in

China.

      7.      Telephone records for all telephones of any type, including, but not limited to,

bills, receipts for payment, installation records and/or service records.

8.  Records, documents, and materials related to the accounting process including general journals and entries, general ledgers, accounts and notes receivable, accounts and notes payable, case receipt and disbursement records, sales records, tax records, payroll journals and ledgers, purchase journals, charts of accounts, profit and loss statements, and balance sheets.

9.  Income tax returns and related documents such as 1099's.

10.  Cash in amounts over $1,000 as well as records, documents, and materials relating to cash in amounts over $1,000, including amounts of cash payments, services rendered in exchange for cash, and the disbursement of cash.

11.  Investment and/or loan records of any kind, including but not limited to, promissory notes, stock certificates, loan agreements, investment agreements, and/or contracts memorializing investments or loans made by or with Robert Tunnell, TCO International, TCO International China Fund, LP, and/or other Tunnell-controlled entities.

12.  Correspondence and communications in written or electronic form, including but not limited to, letters, faxes, emails, proposals, agreements, contracts, and records, to or from Robert Tunnell, TCO International, TCO International China Fund, to or from any current, past, or potential investors in Tunnell's investment programs.

13.  Records or materials relating to the solicitation of investors and prospective investors, including but not limited to investor/customer/client lists, prospectuses sent to actual or potential investors, other solicitation materials, and other communications, including letters, emails, faxes, and other documents Robert Tunnell sent to or received from investors or potential investors in his scheme.

14.   Documents or communications indicating e-mail services used by Robert Tunnell.

15.   Cellular telephone(s), pursuant to the protocol described in Attachment C.

16.   Any computers, computer hardware, computer software, computer documentation, passwords, or data security services, including but not limited to desktop computers, laptop computers, and other devices capable of sending or receiving e-mail, pursuant to the protocol described in Attachment C.

**ATTACHMENT C**

PROTOCOL FOR SEARCHING DEVICES OR MEDIA THAT STORE DATA ELECTRONICALLY

1. In executing this warrant, the government will begin by ascertaining whether all or part of a search of a device or media that stores data electronically ("the device") reasonably can be completed at the location listed in the warrant ("the site") within a reasonable time. If the search reasonably can be completed on site, the government will remove the device from the site only if removal is necessary to preserve evidence, or if the item is contraband, a forfeitable instrumentality of the crime, or the fruit of a crime.

2. If the government determines that a search reasonably cannot be completed on site within a reasonable time period, the government must determine whether all or part of the authorized search can be completed by making a mirror image of, or in some other manner duplicating, the contents of the device and then conducting the forensic review of the mirror image or duplication off site. The government will complete a forensic review of that mirror image within 120 days of the execution of the search warrant.

3. In a circumstance where the government determines that a mirror image of the contents of a device cannot be created on site in a reasonable time, the government may seize and retain that device for 60 days in order to make a mirror image of the contents of the device.

4. When the government removes a device from the searched premises it may also remove any equipment or documents ("related equipment or documents") that reasonably appear to be necessary to create a mirror image of the contents of the device or conduct an off-site forensic review of a device.

5. When the government removes a device or related equipment or documents from the site in order to create a mirror image of the device's contents or to conduct an off-site forensic

review of the device, the government must file a return with a magistrate judge that identifies

with particularity the removed device or related equipment or documents within 14 calendar days

of the execution of the search warrant.

6.    Within a reasonable period of time, but not to exceed 60 calendar days after

completing the forensic review of the device or image, the government must use reasonable

efforts to return, delete, or destroy any data outside the scope of the warrant unless the

government is otherwise permitted by law to retain such data.

7.    The time periods set forth in this protocol may be extended by court order for good

cause.

8.    In the forensic review of any device or image under this warrant the government must

make reasonable efforts to use methods and procedures that will locate and expose those

categories of files, documents, or other electronically-stored information that are identified with

particularity in the warrant, while minimizing exposure or examination of irrelevant, privileged,

or confidential files to the extent reasonably practicable.

9.    For the purposes of this search protocol, the phrase "to preserve evidence" is meant to

encompass reasonable measures to ensure the integrity of information responsive to the warrant

and the methods used to locate same.

## DEFINITIONS FOR ATTACHMENTS B AND C

• The terms "records," "documents," and "materials" include all of the items described in Attachments B and C in whatever form and by whatever means they may have been created and/or stored. This includes any handmade, photographic, mechanical, electrical, electronic, and/or magnetic forms. It also includes items in the form of computer hardware, software, documentation, passwords, and/or data security devices.

• Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, compact flash cards, smart media cards and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

• Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way it works. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs, utilities, compilers, interpreters, and communications programs).

• Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

• Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

## ATTACHMENT D

### ITEMS TO BE SEIZED

The following accounts held at financial institutions.

- All funds up to $520,745 contained in Bank of America account number 07699-40852 in the name of Robert Tunnell and TCO International.

- All funds up to $5,983 contained in Bank of America account number 02896-02681 in the name of Robert Tunnell and Gale Tunnell.

- All funds up to $892,500 contained in Interactive Brokers account number U923461 in the name of Robert Tunnell.